[Alabama Great Southern Ry. Co. v. Smith.]

# Alabama Great Southern Ry. Co. v. Smith.

### Crossing Accident.

(Decided January 13, 1916.  Rehearing denied March 23, 1916.
71 South. 455.)

1. **Railroads; Crossing Accident; Burden of Proof.**—Where the complaint charges wantonness in bringing about the death at a railroad crossing the provisions of § 5476, Code 1907, are without application, and, in such case, the burden is on plaintiff throughout the trial to sustain the allegation of wantonness.

2. **Same; Contributory Negligence.**—Where a deceased, on hearing the approaching train, stopped as if to wait for the train to pass, and then, after looking in the direction from which the train was coming, started to cross the track when the train was about 100 feet away, and the danger was imminent, such deceased was guilty of contributory negligence which deprived his representative of the right to recover on account of any alleged prior negligence of defendant.

3. **Same; Assumption that Danger Would be Avoided.**—Where deceased stopped before going on the crossing as if to await the passing of the approaching train the engineer had the right to assume that deceased would stay in a place of safety.

4. **Same.**—Where deceased stopped on approaching a railroad crossing as if to wait for a train to pass, and then went upon the crossing and was killed, the burden of proof is on plaintiff to show negligence on the part of the engineer after deceased left his place of safety to go upon the track.

5. **Same.**—The provision of § 5476, Code 1907, are without application where the person hit at the crossing was guilty of contributory negligence, as he was in no better case than a trespasser whose peril and presence had been discovered.

6. **Same; Last Clear Chance.**—Where deceased, after stopping to wait for a train to pass, left his place of safety to cross the track when the engine was from seventy-five to one hundred feet away, and the engineer did everything in his power to stop the train, the doctrine of last clear chance has no application, and plaintiff could not recover for negligence subsequent to the discovery by the engineer of the fact that deceased would try to cross in front of the approaching train.

7. **Same; Wantonness.**—In such a case plaintiff could not recover on the ground of wantonness subsequent to the discovery by the engineer of the fact that deceased would try to cross in front of the approaching train.

8. **Witnesses; Bias.**—Notwithstanding the jury is not bound to accept the testimony of a biased witness without reserve, yet the testimony of a witness may not be capriciously rejected.

9. **Railroads; Crossing Accidents; Evidence.**—The evidence in this case examined and held not sufficient to sustain a verdict for the plaintiff.

10. **Pleading; Inconsistent Allegation.**—A complaint is not rendered demurrable because it contains two counts, one charging simple negligence and the other wanton.

11 **Railroads; Crossing Accident; Wantonness.**—Wantonness does not, as a matter of law, grow out of passing at great speed over a populous crossing at grade, but depends upon its reasonableness as measured by conditions to be reasonably anticipated.

12. **Same; Instruction.**—In such an action an instruction that to constitute wantonness, the actual presence of the person injured or killed need not actually be known to those operating a train, although correct in itself, was misleading when coupled with the statement that wantonness consists in passing at great speed over popular crossings at grade.

APPEAL from Birmingham City Court.

Heard before Hon. A. H. ALSTON.

Action by Mrs. Mary M. Smith, as administratrix, against the Alabama Great Southern Railroad Company, for damages for the death of her intestate. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

The facts sufficiently appear from the opinion. The complaint avers that defendant was operating a line of railroad across and on grade with a public highway in the city of Birmingham, and while plaintiff's intestate was upon said highway at a point near Beverly station in said city, said train ran upon or against him, and so injured him that he died. The first count alleges the negligence as follows: Defendant negligently conducted itself in that regard, and as a proximate consequence of said negligence, said train ran upon or against plaintiff's intestate, on the occasion aforesaid, and proximately caused his death.

The second count alleged the negligence as follows: Defendant's servant or agent, upon said train, acting within the line and scope of his employment and authority as such servant or agent, wantonly on the occasion aforesaid, by means of said train, caused the death of said intestate.

The following is charge 12 given for plaintiff: While wantonness grows out of passing at a great rate of speed over a populous public crossing on grade with a railroad, it is not necessary to the completion of such wantonness that the actual presence of the person injured or killed thereby, if one is killed or injured, should have been actually known to those operating the train.

A. G. & E. D. SMITH, for appellant. HARSH, HARSH & HARSH, and FRANK W. SMITH, for appellee.

SAYRE, J.—Appellee's decedent was killed by defendant's train about half past 4 on April 21, 1914, at the Beverly crossing. The place in question was in one of the outer districts of the city of Birmingham, where there were only a few buildings scattered around, but it was where Jefferson street, sometimes referred to as the old Tuskaloosa Road, the main thoroughfare between Birmingham and Bessemer, crossed defendant's main line at grade, and the evidence goes to show that it was a crossing much used by persons passing on foot and in vehicles. On the trial of plaintiff's (appellee's) suit, brought under the Homicide Act, there was verdict and judgment for plaintiff, damages being assessed at $6,500, and from that judgment defendant has appealed, assigning for error, among other things, the action of the court in overruling its motion for a new trial.

All the evidence upon which the jury acted is before us. We have not visited the locus in quo, as did the jury under the court's permission and direction, but a carefully prepared map, drawn to scale and purporting to show street crossings, buildings and street car lines in the immediate vicinity, has been reproduced in the transcript of the bill of exceptions. The accuracy of this map has not been questioned, nor does it disclose any points of difference from the testimony of witnesses many of whom referred to it, thus, and otherwise, locating objects in the neighborhood. There is therefore not the slightest reason for assuming that the jury saw anything which might affect that view of the case which has been forced upon us by what we consider to be quite plain considerations of law and justice.

Weighing the evidence with all proper deference for the jury's findings and for the judgment of the trial judge permitting the verdict to stand, without impeaching the deliberate material testimony of a single witness, drawing only such inferences as a reasoned reflection upon the logic of undisputed facts has rendered necessary, we have learned the relevant material facts involved in the death of plaintiff's decedent as well as any appellate court can ever hope to learn the facts of such a case, and they have produced in our mind a conviction that the verdict was founded upon some erroneous conception in the minds of the jury going to the substantial merits of the cause.

(1) Only three of the witnesses introduced by plaintiff saw the accident. It so chanced that two of them saw deceased only just a moment before he was struck by defendant's engine, the

attention of one of them being attracted by some one saying in a stressful voice, "He can't make it," or "He won't make it." Both these witnesses testified that deceased was on the track when they saw him—one of them saying that "he appeared to be in a hurried gait all right, and the train was right at him, only a few feet from him;" the other, that "when I first saw him he was making his run to get across the track, and when I first saw the train the train was about 30 feet from him." The third of these witnesses, a negro woman, said, "I saw it strike Mr. Smith." She had noticed deceased when he was close to the railroad, but did not undertake to describe his movements upon or immediately before going upon the track. Aside from proving the death of plaintiff's decedent, which was not disputed, the testimony offered by plaintiff appears to have had for its purpose to show that the crossing was in general much used by pedestrians and vehicles, that the train on that occasion was moving with unusual speed, and that no signals of approach were sounded by blowing the whistle or ringing the bell as the statute requires. It may be noted, however, that the weight even of plaintiff's evidence went to show that the whistle was blown sufficiently to put any person near the crossing and in the use of normal faculties on notice that the train was approaching. The only effect, then, to be ascribed to plaintiff's evidence is, that by virtue of the statute it made out a prima facie case of simple negligence under the first count of the complaint. As for the second count charging wantonness, the statute in reference to the burden of proof in cases of death or injury at such places gave no help to it, and the burden of proof as to it rested upon plaintiff consistently throughout the trial.—*Carlisle v. A. G. S. Ry. Co.*, 166 Ala. 591, 52 South. 341.

We come now to the evidence adduced by defendant. The overwhelming weight of this evidence, considered in connection with that offered by plaintiff, went to prove that the whistle was blown and the bell rung. It tended very strongly also to show that the train moved over the crossing at a rate of speed not in excess of the daily average speed at that point. In other respects it was not in conflict with any part of the testimony offered by plaintiff. But it went further, giving a new element, and involving new issues, as to which defendant's evidence was without conflict and had substantial collateral corroboration in the testimony of the witnesses who testified for plaintiff.

(2) This change in the complexion of the case arose out of the following facts:  Plaintiff's decedent approached defendant's track from the north intending to cross over to the south.  The point where he intended to cross, and toward which he went, was in the mist of a broad open space affording him ample opportunity for seeing the approaching train while it was yet 800 feet and more, and he more than 100 feet, away from the crossing. The engineer testified that he saw deceased when his engine was 800 feet from the crossing.  The track was straight and single for more than that distance, and the view considerably more expansive than the right of way.  Deceased had alighted from a street car at the Beverly station at the same time with a boy about 17 years of age.  This street car line at that point came within something like 100 feet of defendant's line and then curved away to Bessemer.  The boy was going in the same direction with deceased, and together they came near to the defendant's track.  They both stopped.  The boy heard and saw the train.  To indulge the inference that deceased was not aware of its approach would be to disregard the common facts of human experience and the only reasonable inference to be drawn from ample evidence, in addition to that of the boy and the engineer, showing his actions at the time. The engineer testified that plaintiff's decedent stopped 10 or 12 feet from the track, and though there were such small differences as usually earmark the truth of evidence to such a point, the great weight of the testimony of a number of witnesses corroborated the engineer on this point. There was no serious difference about it.  Stopping, deceased set a bag or bundle he was carrying on the ground.  One of the witnesses said that he set it on the railing of the walk or footbridge over which he had come, the end of which was at hand.  This could have meant but one thing to the engineer.  After looking in the direction from which the train was coming, deceased picked up his bag or bundle and started hurriedly across the track. Most of the witnesses for defendant who testified to this point say he started to run across.  The boy was most emphatic on this point.  All of those who saw deceased at the time testified in substance that his manner of crossing was hurried.  In this respect defendant's witnesses had substantial corroboration in the testimony of the witnesses for plaintiff to whom we have referred. There can be no sort of doubt about the fact that deceased hurried across the track, nor can anything be clearer than that this

was an act of gross negligence on his part, depriving him of every semblance of right to recover on account of any alleged prior negligence on the part of the engineer.

(3) Conceding that there was a modicum of evidence tending to support the theory that the engineer had previously been negligent in running his train at an excessive rate of speed and without due signals of approach, and, in any event, that such facts as were not in dispute had the effect under the statute to put upon the defendant the burden of proving that there was no original negligence on its part, still, in the situation thus in every material particular fully, clearly, and undisputedly developed and established by the evidence for defendant, the engineer's alleged prior negligence became for all the just and proper purposes of the case a negligible quantity. The crossing was not a stopping place for the train; daily it was operated over that crossing at a speed of 30 to 40 miles an hour; the engineer saw deceased approaching the train, but he saw him stop as if to wait; he thus had a right to assume that deceased would stay in the safe place where he was; and until he started again there was no reason why the engineeer should adopt measures to meet so improbable an emergency as was presented when deceased began to hurry into a place of extreme and most obvious danger.—*Birmingham Ry. Co. v. Bowers*, 110 Ala. 328, 20 South. 345. In this undeniable posture of the case, it must be treated, so far as the question of simple negligence is concerned, as if it had been originally instituted upon the sole theory and claim that the liability of defendant arose out of actionable negligence on the part of the engineer subsequent to his discovery of the fact that plaintiff's decedent would leave his place of safety to go upon the track.— *Helms v. C. of Ga.*, 188 Ala. 393, 66 South. 470.

(4, 5) The only remaining question then, so far as the charge of simple negligence is concerned, is whether the evidence upon the whole afforded any reasonable inference other than that the engineer, after discovering that deceased was, or would put himself, in a position of peril, failed to exert himself promptly and by every means at hand to avert the consequences of the danger into which deceased thus recklessly intruded. On this issue the burden of proof was on the plaintiff. It is of no consequence in this connection whether his decedent may or may not with technical accuracy be referred to as a trespasser; he was guilty of gross negligence; he was clearly in the wrong in going upon the

track as he did; he probably became thereby a trespasser, for it was his duty to know, and evidently he did know, before he made the attempt to cross, that the train was approaching in such proximity as to render the undertaking dangerous.—*Glass v. M. & C. Ry. Co.*, 94 Ala. 581, 10 South. 215. He was in no better case than a trespasser whose presence and peril have been discovered, and the statute no more applied to him than it does to a trespasser.—*L. & N. R. R. Co. v. Jones*, 191 Ala. 484, 67 South. 691; *L. & N. R. R. Co. v. Rayburn*, 192 Ala. 494, 68 South. 356; *Empire Coal Co. v. Martin*, 190 Ala. 169, 67 South. 435.

(6, 7) The engineer's testimony was that when deceased started upon the track, the engine being then about 75 feet from the crossing, "maybe a little more"—in his testimony at the coroner's inquest he had described the distance as being 100 feet—he "slammed on emergency" and did everything else possible to stop the train; that it was impossible to have stopped the train or slackened its speed more than he did. If this was true, plaintiff could not recover for negligence or wantonness subsequent to the engineer's discovery of the fact that deceased would try to cross in front of the approaching train. By way of showing some circumstances in contradiction the brief for appellee refers to that part of the testimony of the engineer in which he said that he saw the parties (by which he meant deceased and the boy with him) when he was 800 feet from the crossing, but that he did not put on brakes until he was within 75 feet of them. But this excerpt from the record is wholly misleading, for the record shows the engineer's testimony to be that when he saw deceased and the boy 800 feet away, deceased was not on the track, nor had he and the boy stopped; they were on the walk approaching the track in close proximity to which they afterwards stopped. The boy did not go upon the track. He waited for the train to pass.

Reference is also made to the testimony of Richie, the witness to whom we have heretofore referred as saying that his attention was attracted by hearing some one say in a stressful voice that he (deceased) could not or would not make it. This witness testified, and this part of his testimony the brief quotes, supplying italics: "The train picked him up on the base beam, I would call it, across the front of the engine where the cowcatcher is fastened in the side, *and he fell off as soon as the brake was set up and stopped the force of* the engine."

All the evidence tended to show that the body of deceased was carried 100 feet before it fell off the engine, this distance

being easily determined by refernce to the spot where it lay immediately after the accident. The testimony quoted last above is supposed to show, that the engineer failed to set the brakes until the train reached the point where the body of deceased fell to the ground. But this testimony at best for appellee shows merely the inference, opinion, or conclusion of the witness, bald and of little or no consequence in the circumstances, to the effect that at the point in question the speed of the train had so far slackened as to relieve the atmospheric pressure created by its motion, which, it may be conjectured, had something to do with keeping the body on the front of the engine.

Appellee also refers to some testimony to the effect that the train moved about a quarter of a mile after passing the crossing; this, we suppose, as tending to prove that no prompt, timely, and efficient effort was made to check the speed of the train. We do not know, and so far as the evidence gave the jury to understand, they did not know, in what distance the train might have been stopped in the conditions prevailing. The fact, if accepted according to appellee's contention, may as well have tended to show the great original speed of the train, and great speed, in view of the uncontradicted evidence as to the actions of deceased and the circumstances in which he went upon the track, could only tend to relieve defendant of the imputation of subsequent negligence or wrong as necessarily increasing the difficulty of avoiding the then impending disaster, for the momentum of a mass in motion increases in proportion to the acceleration of its velocity.

(8) We have no purpose to encroach upon the absolute right of the jury to decide every fairly debatable question of fact, nor do we intend to lay down any rule that would require the jury in any case to accept without reserve the testimony of any witness who may be biased by thought of the consequences to flow from a situation like that in which the engineer in his case found himself. On the other hand, the testimony of witnesses is not to be rejected capriciously, and here uncontradicted facts conspire most convincingly to demonstrate that when appellee's decedent started to cross the track he was already in all human probability doomed as for anything it was then in the power of the engineer to do. Consulting common experience and observation with a careful regard for the facts of this particular case, we feel entirely safe in saying that, moving hurriedly as deceased did, two

or three seconds took him within the fatal sweep of the train, while three or four might possibly have put him across ahead of the engine by the narrowest of margins. The train was moving rapidly, no doubt, but whatever its speed, the outside limit of time in which the engineer had to act was measured by the time required to take deceased across and to a place of safety on the other side. In these crowded moments the engineer had to get a grasp on the new situation thus suddenly thrust upon him, had to execute the orders of his reason by manipulating the appliances of his machine, and these operations had to take effect upon a train that consisted of a locomotive and five or six coaches. It is perfectly clear upon the whole evidence that deceased, being in a place of safety and aware of the train's approach, tested its speed, and took a chance that must have looked desperate to any man in the normal use of his faculties. It cannot be said that another step might not have saved him, but that is a mere speculation, and there is no reason whatever for doubting that the engineer made an effort to afford deceased an opportunity to escape, and a finding that in the exercise of due care according to the circumstances he failed to do something that he could have done, more or better than he did, and that what he might have done would have been effectual to avert the disaster, is not to be justified on grounds of reason or probability, though theoretically the issue may have been one for jury decision in the first place under our theory of jury trials.

Ordinarily just reasons for the verdict of a jury are not hard to find upon the face of the record of the evidence. In this case, if the verdict had been for the defendant, no one could have doubted that such result was prima facie fair and just. But in view of the jury's conclusion to the contrary, it has seemed necessary by a close examination of the record to identify and define those controverted issues of fact upon which a just resolution depended, and then to consider the reasonableness of the result in view of the issues thus identified and defined and the evidence having proper and material bearing upon them. The justification of the result in every case may be thus brought on review to the test of judicial reason, and in this case our judgment is, not only that plaintiff failed to sustain the burden of proof resting upon him in respect of the final and controlling issue in the cause arising out of the charge of subsequent negligence, but that, after according every reasonable presumption in favor of the

verdict and judgment below, the preponderance of the evidence against the verdict is so great as to leave no substantial doubt that it was wrong and unjust.

It follows also that, if there was no actionable negligence after the engineer discovered that plaintiff's decedent would go upon the track, then, under the law, there could have been no subsequent act of wanton wrong.—*Helms v. Central of Georgia, supra.*

(10-12) There was no error in overruling the demurrer to the two counts of the complaint, charging, respectively, simple negligence and wantonness. Nor was there error in the court's rulings on the numerous special instructions requested by the parties, except in one instance. Charge 12, given on plaintiff's request, was, we think, misleading and positively erroneous. This charge was probably accepted by the jury as indicating an assumption on the part of the court that defendant's train passed the crossing at a great, and therefore reprehensible, rate of speed. But whether so or not, speed is a relative term, and whether a given rate, though great in a sense, is evidential of negligence or wantonness, depends upon circumstances and conditions of which the charge takes no account. The charge is far from merely asserting "the legal proposition that there may be wantonness on the part of a person who shows a reckless disregard for human life, even if at the instant he does not know some one is actually present to be injured by his reckless act," which is the effect attributed to it in the brief for appellee. It purports to state the circumstances out of which wantonness arises, and that the statement is inadequate and erroneous seems quite clear. Although the rate of speed was great and maintained over a "populous" public crossing at grade, the question of wantonness depended upon its reasonableness as measured by conditions to be reasonably anticipated at the time and the adequacy of precautions taken against the danger arising out of those conditions, as by sounding signals of approach. Wantonness does not as matter of law grow out of passing at great speed over a "populous" public crossing at grade, and the further assertion of the charge, that to constitute wantonness the actual presence of the person injured or killed need not be actually known to those operating the train, however correct in itself, had the effect of accentuating its error in omitting specific reference to other evidential considerations from which may be inferred

wantonness, imputed intention to do wrong, or a universal malice, as it was aptly termed in *Weatherly v. N. C. & St. L. Ry.*, 166 Ala. 575, 51 South. 959. To say simply that a public crossing is "populous" is to inadequately express one of the essential elements of fact about which the law concerns itself in dealing with grade crossing accidents. The fact, without more, that a crossing is within municipal corporate bounds signifies but little. A crossing may be said to be "populous" when it is at customary times used by many people, though at other times or hours it may be deserted. Hence, in defining wantonness at such places, the court has constantly spoken in its decisions of a knowledge of existing circumstances and conditions, or a knowledge that they probably existed at the time, as an element of necessary consideration. No doubt that the considerations to which we have referred were of much importantce to defendant in any correct solution of the issue of wantonness or reckless disregard for probable consequences in the manner of approaching the crossing; for unquestionably the weight of the evidence proved signals of approach, and while it showed that the accident occurred in the mid-afternoon of a day in April and at a place described in general terms as a much frequented public crossing, there was in the evidence no intimation of any crowd or confusion of vehicles or pedestrians, nor any that defendant's engineer, who ran the same train over the same crossing at substantially the same rate of speed at the same hour day after day, had any reason to anticipate that any harm would probably result from his operation of the train at the time in question.

For error in giving this charge and in denying the motion for a new trial on the substantial merits of the cause, the judgment must be reversed.

Reversed and remanded.

ANDERSON, C. J., and McCLELLAN and GARDNER, JJ., concur.